## JACOB SKILLMAN v. LISCOMB R. TITUS.

Where an ordinary bank check, drawn payable " to A B, or bearer," is endorsed by the holder to a third person for a valuable consideration, and it appears that at the time of endorsement, the abbreviation "Mem." was on the face of the check, and that two years and a half had elapsed since it was drawn, the circumstances indicated that the check was not given in the usual course of business, and were sufficient to put the endorsee upon inquiry; and if, for want of proper inquiry, he suffers loss, he has no ground of complaint against the drawer of the check.

Action of *assumpsit*, and verdict for the plaintiff. A rule to show cause why the verdict should not be set aside and a new trial granted was allowed, on the ground that the verdict was against the weight of evidence.

The rule was argued before the CHIEF JUSTICE, and Justices ELMER, BEDLE, and HAINES.

For the rule, *A. G. Richey.*

Contra, *Chas. A. Skillman.*

HAINES, J. This action was brought to recover the amount claimed to be due upon a check, made by the defendant on the twenty-fourth day of April, 1861, on the Trenton

Banking Company, for three hundred dollars, payable to "A, B, or bearer," and delivered to Andrew R. Titus, and by him transferred to the plaintiff, in the fall of 1863.

A verdict having been rendered for the plaintiff, the defendant now seeks to have it set aside, on the ground that it is against the weight of evidence. To determine the question, it is necessary to examine the testimony and the proofs.

The plaintiff, himself has no other knowledge of the matter, than that he received the check in payment of cattle sold to Andrew R. Titus before the election of 1863, and that the defendant refused to pay it.

Andrew R. Titus, to whom it was delivered, testifies that it was given for money lent to the defendant; that it was not to be presented at the bank, but to be paid by the defendant in a few days. This is expressly denied by the defendant, who says that he had for a long time been the endorser of Andrew, and was responsible for him in a considerable amount of money; that Andrew, becoming embarrassed, proposed to the defendant to secure him and some other confidential creditors, and for that purpose transferred to him some real estate, and afterwards made a sale to him of his goods and stock in trade, and gave him a bill of sale for the same, and took the defendant's note for five thousand dollars. He says that it was understood between them, that Andrew should continue to sell the goods, and to apply the avails of the sales to the confidential debts, and the liabilities of the defendant for him; that, needing the sum of three hundred dollars to pay some of the claims, he applied to Andrew for it; that Andrew replied that he thought the defendant had received enough to pay all the confidential debts; that the defendant thereupon told him that if he had received enough for that purpose, he would return the money on the final settlement; that he then took the money and gave the check in question, writing upon it the letters "Mem."

He further says, that he has made an estimate, as near as he can, and that there is yet due to him from Andrew, for confidential debts and interest, nearly three thousand dollars.

Here is an apparent conflict of testimony, one party affirming that the check was given for money lent; the other, that it was to pay some confidential debt, and to be accounted for on settlement. It is proper, therefore, to look for testimony to corroborate the one or the other, so as to determine which of them is correct.

There is in evidence the bill of sale of the goods, and the note for five thousand dollars given for them, and endorsements on the note of divers sums of money, paid by the defendant in discharge of the debts and liabilities of Andrew, to nearly its full amount.

Andrew, on cross-examination, says, that some of the money for which the check was given, was of the proceeds of the sales of the goods. If so, that part at least belonged to the defendant, unless all the confidential debts were then paid, which is not now pretended. This would seem to corroborate the defendant, and to show that a part of the money was not Andrew's to lend.

On the twenty-fourth of March, 1861, about a month before the date of the check, Andrew had made a general assignment for the benefit of creditors, and made the usual oath that the schedule annexed was a true inventory of his estate, real and personal. If that were true, he had no other source from which to derive the money, except the store goods before sold to the defendant, who is thus further corroborated.

But, as if in explanation of this, Andrew says that he had reserved some money at the time of making the assignment, and had told the defendant that it was all the money he had reserved to go upon the farm.

This tends rather to diminish than to increase the strength of his testimony. It presents the natural inquiry, why an insolvent man should lend the only money he had to go upon his farm, and to provide for his family, to one not embarrassed, and then to suffer it to remain unpaid and unasked for, during a period of two and a half years. It could hardly have been from considerations of delicacy, for they usually yield to a man's necessities. Nor could it have been from

friendship and fraternal feelings; for he says he had no opportunity of asking about it, for his brother, whom he frequently met, would not speak to him.

As between these parties, the weight of evidence seems to be clearly with the defendant; and that the money was not strictly lent, but paid to the defendant to apply to confidential debts, and to be accounted for on final settlement.

The question then arises, as to how the plaintiff is to be affected by this. He is shown to have been a holder of the check for a valuable consideration; he took it in payment of cattle sold and delivered.

Did he receive it without notice of its character? The abbreviation, "Mem.," was on the check when he took it, and the plaintiff says he may have seen it. The presumption of law is, that he did see and read it; it was there on the face of the check; if he neglected to read it, that was his own fault. Those letters indicate that the check was not given in the usual course of trade. The date of the check, too, shows that there was something peculiar about it; that it had been outstanding two and a half years, and that, together with the particle "Mem.," was sufficient to put the plaintiff on inquiry.

If the mere past maturity of a promissory note, is notice to an endorsee, surely, the outstanding, for the unusual and unreasonable period of two and a half years, of a common bank check with the letters "Mem." on its face, is notice that it was not given in the usual course of trade.

The plaintiff had sufficient notice to put him on inquiry; and if he has sustained loss by his negligence, he has no ground of complaint against the defendant.

I think the verdict was clearly against the weight of evidence, and that it should be set aside and a new trial granted, on the payment of the costs of the former trial.

CHIEF JUSTICE BEASLEY and Justice BEDLE concurred. Justice ELMER, who also heard the case, being detained from the court by sickness, gave no opinion.